IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

HARRIET MOORE,                        CASE NO.: 14-cv-62709-WPD

       Plaintiff,

vs.

SETERUS, INC.,
A Delaware Corporation, and
QBE FIRST Insurance Agency,
A California Corporation and
QBE Specialty Insurance Company,
       Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff Harriet Moore by and through undersigned counsel and pursuant to Federal Rule of Civil procedure 15(a)(2) hereby serves her Amended Complaint for Damages alleging claims against Defendants  QBE FIRST Insurance Agency and QBE Specialty Insurance Company Seterus Inc. Only the claims against Seterus are affected by this amendment, and no changes are made to the claims against QBE FIRST Insurance Agency or QBE Specialty Insurance Company from those in the original Complaint.

### I.  THE PARTIES, JURISIDICTION AND VENUE

1.      Plaintiff Harriet Moore is a natural person, over the age of 21.  She is a citizen of the State of Florida and resides in Broward County, Florida.  She is referred to hereafter as "Borrower."

2.      Defendant Seterus, Inc. ("Servicer") is a Delaware Corporation with its principal place of business in the State of North Carolina.  Servicer is engaged in servicing federally

related mortgage loans secured by real property throughout the United States and the State of Florida.  As a mortgage servicer, Servicer is subject to specific federal laws and administrative regulations governing its mortgage serving activities.  These laws and regulations include, but are not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et. seq.* (hereinafter RESPA) and Regulation X, 12 C.F.R § 1024.35 (e), hereinafter "Regulation X." Servicer acquired the right to servicer Borrower's mortgage loan after it was in default, making servicer a "debt collector" as that term is defined by the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* ,alsos known as the "FDCPA."

3. Servicer services Borrower's mortgage loan, and many other similar residential mortgage loans, secured by real property located in Broward County, Florida, and thus engages in substantial business activity in the State of Florida and the territorial jurisdiction of this Court.

4. Borrower asserts claims against Servicer under the FDCPA.  Accordingly, this Court has federal question jurisdiction over the FDCPA dispute between Borrower and Servicer under 28 USC § 1331.

5. Defendant QBE FIRST Insurance Agency is a California corporation with its principal place of business in the state of Georgia. This defendant is licensed by the Florida Department of Financial Services as an insurance agency and also as a surplus lines insurance broker and engages is substantial business activity within the State of Florida including this Court's territorial jurisdiction.

6. Defendant QBE Specialty Insurance Company is a North Dakota corporation with its principal business in the State of New York.  This defendant is authorized by the Florida Department of Financial Services to sell surplus lines insurance in the State of Florida, and currently insures risks located in the State of Florida and the territorial jurisdiction of this Court.

7. Defendant QBE First Insurance Agency will be referred to hereafter as "QBE FIRST."  Defendant QBE Specialty Insurance Agency will be referred to hereafter as "QBE Specialty."  Both of these Defendants will be referred to collectively as the "QBE Defendants."

8. Borrower asserts a Florida common law claim for tortious interference with a business relationship against the QBE Defendants.  Because the amount of Plaintiff's claim, including punitive damages, exceeds $75,000 and there is complete diversity of citizenship between Plaintiff and the QBE Defendants,  this Court has diversity jurisdiction over this claim pursuant to 28 USC § 1332.

## II. GENERAL ALLEGATIONS

9. Borrower owns a home located in Sunrise, Florida.  This home is subject to a first mortgage lien serviced by Servicer.  However, there is no contract, nor any debtor/creditor relationship between Borrower and Servicer.  The mortgage loan actually belongs to the Federal National Mortgage Association, also known as "Fannie Mae' or "FNMA" and referred to hereafter as "FNMA."   The mortgage related contracts, and the debtor/creditor relationship are between Borrower and FNMA.   Prior to 2008 FNMA was private corporation.  However, during the 2008 financial crisis,  FNMA was placed under the conservatorship of the Federal Housing Finance Agency, referred to hereafter as "FHFA."  FHFA is an instrumentality of the United States Government.

10. In its final rule and official interpretations implementing the recently amended version of Regulation X, (12 C.F.R Part 1024) the  Consumer Financial Protection Bureau describes the mortgage servicing industry as follows: [1]

---

[1] The text of this paragraph, is quoted from the Final Rule and Official Interpretations promulgated by the Consumer Financial Protection Bureau, pages  14-17  Available at

> [m]ortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income.
>
> In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans.
>
> Contracts between the servicer and the mortgage loan owner specify the rights and responsibilities of each party… servicer contracts govern servicer requirements to advance payments to owners of mortgage loans, and to recoup advances made by servicers, including from ultimate recoveries on liquidated properties.
>
> Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. Such compensation structures incentivize servicers to ensure that investment in operations closely tracks servicer expectations of delinquent accounts, and an increase in the number of delinquent accounts a servicer must service beyond that projected by the servicer strains available servicer resources. A servicer will expect to recoup its investment in purchasing mortgage servicing rights and earn a profit primarily through a net servicing fee (which is typically expressed as a constant rate assessed on unpaid mortgage balances), interest float on payment accounts between receipt and disbursement, and cross-marketing other products and services to borrowers. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers greatly vary in the extent to which they invest in customer service infrastructure. For example, servicer

---

http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf (Last Visited on November 26th, 2014)

staffing ratios have varied between approximately 100 loans per full-time employee to over 4,000 loans per full time employee. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly.

Servicers also earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements. As a result, servicers have an incentive to look for opportunities to impose fees on borrowers to enhance revenues. These attributes of the servicing market created problems for certain borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers even during regional mortgage market downturns that preceded the financial crisis. There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices.

11. Servicer has entered into a separate arrangement with Defendant QBE FIRST whereby QBE FIRST monitors the loans within Servicer's servicing portfolio in order to determine whether the borrowers maintain insurance coverage that complies with the borrower's obligations under the mortgage contract. When QBE FIRST determines that appropriate coverage is not in place, it obtains substitute force-placed insurance through other QBE affiliated insurers, including QBE Specialty.  QBE FIRST is also involved in administering the escrow accounts for the loans that Servicer services, and that necessarily includes arranging for the payments for the renewal of borrowers insurance policies.

12. However, the arrangement between Servicer and QBE FIRST presents a conflict of interest because force-placed insurance is extremely lucrative. QBE FIRST therefore has a

business incentive to force-place insurance whenever possible. Furthermore, QBE FIRST has agreed to undertake the tracking and escrow services that it performs for Servicer for less than the cost of delivering those services making the tracking services a cost of doing business necessary to secure lucrative force-placed insurance policies.

### COUNT I TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (AGAINST THE QBE DEFENDANTS)

13.   Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 12 above.

14.   The QBE Defendants had knowledge of the relationship between Borrower and FNMA. The QBE Defendants are not third-party beneficiaries to any contracts between Borrower and FNMA.

15.   Cognizant of the "high volume low margin" nature of mortgage loan servicing described by the Consumer Financial Protection Bureau and referenced in Paragraph 10 above, the QBE Defendants exploited the conflict of interest between Servicer and FNMA by entering into a quid pro quo arrangement whereby QBE FIRST agreed to perform loan tracking, escrow management, and other servicing functions on Servicers behalf and for a fee that was less than the cost of providing the servicing related services. This reduced Servicer's operating expenses, but did not decrease the amount it charged FNMA for servicing Borrower's loan. In exchange, QBE FIRST was rewarded with the exclusive right to provide lucrative force-placed insurance on the loans with Servicer's portfolio. QBE FIRST select its affiliate QBE Specialty for Borrower's force-placed flood insurance and was rewarded with a "commission" equal to half the entire premium. As noted above, this premium was more than five times the amount of the premium that QBE FIRST, failed to renew on Servicers behalf as expressly required by FNMA's guidelines.

16. Even if the QBE defendants arguably are not strangers to the business relationship between Borrower and FNMA, their interference involving the force-placed insurance floods insurance policy on Borrower's property was not justified or privileged because the QBE Defendants were not acting under the mortgagee/investor's instructions and the QBE Defendants' actions were done in bad faith.

17. Furthermore, the QBE Defendants' actions relating to the force-placed flood insurance policy on Borrower's home were contrary to the interests of FNMA, and against FNMA's express written policy.

18. In addition, the QBE Defendants' conduct substantially increased the amount of Borrower's monthly payment, and thereby caused, or the very least contributed, her subsequent inability to make her modified mortgage payments.

19. Each of the force-placed flood insurance policies on Borrower's home cost more than 5 times the premium of readily available insurance coverage offered through the National Flood Insurance Program.

20. By effectively bribing Servicer in order to secure the right to provide unreasonably expensive force-placed insurance flood insurance on Borrowers' property, the QBE Defendants intentionally and unjustifiably interfered with the business relationship between Borrower and FNMA by improperly inflating the amount of money that Borrower owed on her mortgage loan and dramatically increasing the risk that their mortgage loan would go into default thereby damaging both Borrower and FNMA.

21. Through her relationship with FNMA, Borrower had the right to use the mortgage funds provided to purchase her home, and to repay the borrowed funds at an agreed upon interest rate and subject to the various terms and conditions of the mortgage. As a result of

the QBE Defendants' interference in that relationship, Borrower's rights were violated because her indebtedness was enhanced by exploitative, extortionate, and unreasonable force-placed insurance premiums that were contrary to both Borrower's and FNMA's reasonable commercial expectations and imposed solely to produce an unreasonable profit for the QBE Defendants.

22. As a result of QBE Defendants' tortious interference in her business relationship with the mortgagee/investor, Borrower has been damaged. These damages include additional debt arising from the inflated force-placed flood insurance premiums that has been added to Borrower's mortgage, and may even have caused a wrongful foreclosure which could ultimately result in the loss of her home.

23. The QBE Defendants tortious interference with Borrower's relationship with FNMA was intentional and the QBE Defendants had actual knowledge of the wrongfulness of their conduct.

24. The QBE Defendants' tortious interference in the relationship between Borrower and FNMA was motivated solely by an effort to obtain unreasonable financial gain.

25. The QBE Defendants had actual knowledge that their tortious interference in the relationship between Borrower and FNA would harm Borrower.

26. The QBE Defendants' have earned substantial profits from their tortious interference with Borrowers' relationship with FNMA through similar misconduct affecting a large number of similarly situated borrowers and investors. In order to deter similar misconduct in the future, an award of punitive damages is appropriate.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, against each of the QBE Defendant jointly and severally together with an award of the costs of this action.

## COUNT II – VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT
## (AGAINST SERVICER)

27.     Borrower re-alleges and incorporates by reference the allegations in Paragraphs 1 Through 12 above.

28.     The Fair Debt Collection Practices Act (15 U.S.C. §1692e(2)(a) expressly prohibits a debt collector from misrepresenting the "character, amount or legal status" of a consumer debt.  Similarly 15 U.S.C. §1692(10), prohibits [t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

29.     On or about March 31st, 2014,  Seterus sent Borrower correspondence relating force-placed insurance as part of an "attempt to collect a debt." A true and correct copy of that correspondence is attached hereto as Exhibit "A."  Seterus sent nearly identical correspondence to Borrower again on or about September 4th, 2014.

30.     That correspondence states in pertinent part that, pursuant to the arrangement between Seterus and QBE FIRST, "…incidental services associated with the tracking of your voluntary coverage are provided at minimal cost to Seterus, Inc.  No additional charges will be imposed upon you for these services."

31.     However, the assertion that "no additional charges will be imposed upon [Borrower] is objectively false, or at the very least misleading.  The cost of the subsidized outsourcing services that QBE FIRST provides to Seterus is directly included in the force-placed insurance premium, which is dramatically higher than voluntary coverage, and which was passed on to Borrower.

32.     Seterus's  false or misleading representation that the Borrower would not be

charged for Seterus's subsidized outsourced services violates both 15 U.S.C. §1692e(2)(a)'s and 15 U.S. C. §1692(10)'s prohibition against false or misleading representations made in the collection of a debt.

33.     As a result of Servicer's violation of the FDCPA's prohibition against false or misleading representations in the collection of a debt Borrower entitled to an award of statutory damages in the amount of $1000 pursuant to 15 U.S.C. 1692k.

34.     Borrower has retained undersigned counsel to represent her in this action, and is entitled to an award of prevailing party attorney's fees pursuant to 15 U.S.C. 1692k.

**DEMAND FOR TRIAL BY JURY**

Borrower demands trial by jury on all claims so triable.

Respectfully Submitted,

THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1999 N. UNIVERSITY DRIVE. STE. 213
CORAL SPRINGS, FL 33071
Phone:  (954) 942-5270
Fax:     (954) 942-5272
Email:   jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732

**LEGAL AID SERVICE OF BROWARD COUNTY, Inc**.
491 N. State Road 7
Plantation, FL. 33317
**Jennifer T. Harley ESQ.**
jharley@legalaid.org
Fla. Bar No. 962821
Co-counsel for Plaintiff